# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**SECURITIES AND EXCHANGE COMMISSION,**
**Plaintiff,**

**-vs-** **Case No. 6:08-cv-275-Orl-28KRS**

**GMC HOLDING CORPORATION, RICHARD BRACE,**
**Defendants.**

---

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the following motion:

| | |
|---|---|
| **MOTION:** | **PLAINTIFF'S AMENDED MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT GMC HOLDING CORP. (Doc. No. 24)** |
| **FILED:** | **November 6, 2008** |

Plaintiff Securities and Exchange Commission (SEC) moves for entry of default judgment against defendant GMC Holding Corp. ("GMC"). In support of the motion, the SEC submitted a supplemental brief, Doc. No. 26, and the Declaration of Karaz S. Zaki ("Zaki Decl."), Doc. No. 23-2.

**I. PROCEDURAL HISTORY.**

The SEC filed its complaint against GMC and Richard Brace on February 22, 2008. Doc. No. 1. Brace was the registered agent for GMC and was served on behalf of GMC. Doc. No. 9. On March 20, 2008, Brace filed a response to the complaint "as CEO of GMC." Doc. No. 10 at 1. The Court construed Brace's response as being filed solely on behalf of Brace, and ordered GMC to file

its response to the complaint on or before April 28, 2008. Doc. No. 12. GMC was advised that failure to respond may result in entry of a default against GMC. *Id.*

On April 22, 2008, the SEC moved to approve a consent judgment against Brace and entry of a permanent injunction. Doc. No. 13. The Court issued a Judgment of Permanent Injunction and Other Relief as to Brace. Doc. No. 14.

Upon the SEC's renewed motion, the Clerk entered default against GMC on May 30, 2008. Doc. No. 18. Presently before the Court is the SEC's amended motion for default judgment against GMC.

## II. ALLEGATIONS OF THE COMPLAINT.

In the complaint, the SEC alleges that GMC raised money from investors and pumped up its stock price by issuing press releases on June 27 and July 1, 2005 touting independent tests purportedly confirming it had accomplished a stunning advance in engine technology: a motor with what GMC called a "REMAT" mechanism that, with 150% power efficiency, generated more energy than it consumed. *Id.* ¶¶ 1-2, 10, 12-15. GMC's press releases directed investors to the company's website to view the test results. *Id.* ¶ 13. The GMC website also contained a photo of the REMAT motor and a purported copy of a report by a licensed professional engineer, Eugene Augustin, confirming GMC's test results. *Id.* ¶¶ 13, 17. Defendants, however, altered Augustin's report to exclude important limitations, including that the motor's efficiency lasted only a few minutes and that GMC was unable to duplicate the results in subsequent tests. *Id.* ¶ 17. The press releases also referred to and quoted from this report. *Id.* ¶¶ 12-15. The information on the website, which was incorporated into press releases, was materially false and misleading and operated as a fraud or deceit upon purchasers and prospective purchasers of securities. *Id.* ¶¶ 14, 16-17, 41.

GMC's press releases failed to disclose material facts, such as that the quotations attributed to the engineer were not contained in his report. *Id.* ¶ 16. The press releases also did not disclose that the engineer who wrote the report had asked GMC to stop distorting and using it, and that the engineer's license had expired two years before he issued his report. *Id.* ¶ 18. After each of the press releases, GMC's share price rose significantly, including once to an all-time high. *Id.* ¶¶ 13, 15.

During February and March 2006, GMC continued raising money from investors by issuing three more fraudulent press releases. *Id.* ¶¶ 1-2, 19-25. One of these releases baselessly claimed an imminent sale of GMC's technology for $350 to $500 million (with 96% of the revenue going to GMC shareholders), and that S&P 500 companies were among those negotiating with GMC. *Id.* ¶¶ 20-21, 25. GMC's two other releases in this period continued touting the fake asset sale by falsely claiming the company had chosen a top corporate law firm to negotiate what GMC's release called "the impending asset acquisition" of its motor technology. *Id.* ¶¶ 23-24. After the false press releases, GMC's share price rose by 219% and 44%, respectively, and its trading volume shot from 7,000 to 500,000 shares in one day. *Id.* at ¶¶ 22-23.

From at least 2005 until the SEC suspended trading in GMC stock in March 2006, GMC financed its operations through stock offerings that illegally circumvented the registration requirements of the federal securities laws. *Id.* ¶¶ 1-2, 6, 26-31, 34-35. These stock offerings were GMC's sole source of funding. *Id.* ¶¶ 1, 26. GMC's stock offerings and sales failed to qualify as private placements or for any of the other exemptions to the registration requirements. *Id.* ¶¶ 26, 28-30. Defendants did not provide investors with private placement memoranda or other written materials or otherwise provide meaningful access to information equivalent to that found in registration statements. *Id.* ¶ 29. Instead of registering its stock offerings and sales as it should have,

GMC raised more than $2 million dollars through illegal sales of nonrestricted GMC stock. The company accomplished this by improperly exchanging restricted stock for a GMC director's purportedly free-trading shares, and then selling those shares to investors without registering those sales with the SEC. *Id*. ¶¶ 26-28, 31. The Defendants used communications in interstate commerce and of the mails to offer to sell these shares. *Id.* ¶ 35.

**III. STANDARD OF REVIEW.**

A court may enter a default judgment only if the factual allegations of the complaint, which are assumed to be true, provide a sufficient legal basis for entry of a default judgment. *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law."). Therefore, in considering a motion for default judgment, a court must examine the sufficiency of the allegations in the complaint to determine whether the plaintiff is entitled to a default judgment. *Fid. & Deposit Co. v. Williams*, 699 F. Supp. 897, 899 (N.D. Ga. 1988).

"Although a defaulted defendant admits well-pleaded allegations of liability, allegations relating to the amount of damages are not admitted by virtue of default. Rather, the Court determines the amount and character of damages to be awarded." *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999). If a default judgment is warranted, the Court may hold a hearing for purposes of assessing damages. *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997) (citing Federal Rule of Civil Procedure 55(b)(2)). However, a hearing is not necessary if sufficient evidence is submitted to support the request for damages. *Id.*

## IV. ANALYSIS.

*A. Liability.*

The complaint contains three counts of violation of the Securities Act of 1933 ("Securities Act") and one count of violation of the Securities Exchange Act of 1934 ("Exchange Act"). I will address each count below.

**1. Count One - Sales of Unregistered Securities.**

Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c), prohibit selling or offering to sell or buy securities by using communications in interstate commerce or of the mails without either having an effective registration statement filed with the SEC as to those securities or qualifying for an exemption from the registration requirement. "To establish a prima facie case of violation of section 5, a plaintiff need allege only the sale or offer to sell securities, the absence of a registration statement covering the securities, and the use of the mails or facilities of interstate commerce in connection with the sale or offer." *Raiford v. Buslease, Inc.,* 825 F.2d 351, 354 (11th Cir. 1987) (citing *Swenson v. Engelstad*, 626 F.2d 421, 424-25 (5th Cir.1980)). Scienter is not an element of a section 5 violation. *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004)(citing *Swenson*, 626 F.2d at 424).

As described above, the SEC alleged that GMC made use of communications in interstate commerce or of the mails to offer to sell unregistered securities. By failing to respond, GMC has admitted these facts. Therefore, GMC violated section 5.

**2. Counts Two through Four - Fraud in Securities Sales.**

The SEC alleged that GMC engaged in a fraudulent scheme to sell securities in violation of section 10(b) and rule 10b-5 of the Exchange Act and section 17(a)(1)-(3) of the Securities Act. 15 U.S.C. § 77q(a), 15 U.S.C. § 78j(b); 17 C.F.R. § 240.

> To prove a 10(b) violation, the SEC must show (1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter. To show a violation of section 17(a)(1), the SEC must prove (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with scienter. Finally, to show that the defendants violated section 17(a)(2) or 17(a)(3), the SEC need only show (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with negligence.

*SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007)(internal citations omitted).[1] The misrepresentations or misleading omissions must be conveyed through use of any means or instruments of transportation or communication in interstate commerce or by use of the mails. 15 U.S.C. § 77q(a), 15 U.S.C. § 78j(b).

The misrepresentations in this case were communicated through press releases and GMC's website. The complaint fails to allege the manner in which the press releases were conveyed.[2] With respect to the false statements contained on GMC's website, the Court notes that the United States Court of Appeal for the Eleventh Circuit has held in other contexts that the internet is an

---

[1] The scope of liability under section 10(b) and rule 10b-5 is the same. *Merchant Capital*, 483 F.3d at 766 n.17.

[2] The Court should decline the SEC's invitation to take judicial notice of the manner in which companies issue press releases as the SEC has not cited sources supporting its argument that press releases are necessarily distributed through the mail and over the internet rather than, for instance, hand delivery at a press conference.

instrumentality of interstate commerce. *See United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004). At least one district court within the circuit has found that use of an internet web site to sell securities constituted use of the instrumentalities of interstate commerce. *SEC v. Phoenix Telecom, L.L.C.*, 239 F. Supp. 2d 1292, 1298 (N.D. Ga. 2000). Accordingly, to the extent that GMC used the internet to make material misrepresentations or materially misleading omissions in connection with the offer or sale of securities, the SEC has satisfied the jurisdictional element of a violation of section 10(b), rule 10b-5 and section 17(a).

Turning next to the elements of the claims, by defaulting GMC admits that it altered Augustin's report to make false statements about the efficiency of the REMAT motor and to include statements that were not contained in Augustin's report. As such, GMC admits that the false representations were material because there was "'a substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *See Basic v. Levinson*, 485 U.S. 224, 231-32 (1988)(quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. at 449).

GMC also admits that the false representations on the website were made as part of a scheme to defraud investors. This is sufficient to satisfy the second element of sections 10(b) and 17(a) because the misrepresentations were made "'in a manner reasonably calculated to influence the investing public. . . .'" *Cooper v. Pac. Life Ins. Co.*, 229 F.R.D. 245, 252 (S.D. Ga.2005)(quoting *SEC v. Texas Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968)); *see also SEC v. Zandford*, 535 U.S. 813, 819-22 (2002).

Finally, scienter is defined as either knowing misconduct or severe recklessness. *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982). By defaulting, GMC admits that it altered

Augustin's report and posted the changed report on its website. This is knowing misconduct sufficient to establish scienter.

Having admitted all of the elements of each cause of action, GMC has violated sections 10(b) and 17(a)(1)-(3) and rule 10b-5.

*B. Damages and Remedies.*

The SEC requests permanent injunctive relief, disgorgement of ill-gotten gains, pre-judgment interest on the amount disgorged, and imposition of a civil monetary penalty. I will address each item below.

**1. Permanent Injunctive Relief.**

"The SEC is entitled to injunctive relief when it establishes (1) a prima facie case of a previous violation of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." *Calvo*, 378 F.3d at 1216. The Court should consider the following factors in determining whether a wrong will be repeated: "'egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of the conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.'" *Id*. (quoting *Carriba Air*, 681 F.2d at 1322).

The SEC has not presented evidence that GMC previously violated a federal securities law. It did not argue this element of the *Calvo* test in either its initial or supplemental memoranda. Accordingly, the SEC has not established that permanent injunctive relief is warranted as to GMC.

**2.     Disgorgement.**

The SEC seeks disgorgement of the $2,090,000.00 that GMC realized through its fraudulent scheme. "The purpose of disgorgement is . . . to deprive the wrongdoer of his ill-gotten gain." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005)(internal quotation marks omitted). The SEC "is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains." *Calvo*, 378 F.3d at 1217 (citations omitted). "Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id*. (quotation marks, alterations, and citations omitted).

The SEC submitted the Declaration of Karaz S. Zaki to establish the amount GMC received through its securities fraud. Zaki, a certified public accountant, averred that he reviewed GMC's bank records for two accounts – the "Regions account" and the "RBC account." Zaki Decl. ¶ 3. Zaki avers that approximately $2.3 million in investor funds were deposited into these accounts from on or about June 2005 through April 2006. *Id.* ¶ 6. Of these amounts, Brace received checks approximating $210,000.00. *Id.* ¶ 7. Therefore, GMC should be required to disgorge the amount of investor funds deposited in its accounts – $2,300,000.00 – less the amount disbursed to Brace – $210,000.00 – for a total disgorgement amount of $2,090,000.00.

**3.     Prejudgment Interest**.

The SEC also seeks prejudgment interest on the amount of disgorgement at the interest rate that the IRS uses to determine interest due on underpaid taxes. The decision to grant prejudgment interest, as well as the rate at which interest is awarded, is within the Court's discretion. *SEC v. Carrillo*, 325 F.3d 1268, 1273 (11th Cir.2003)(citing *Indus. Risk Insurers v. M.A.N.*

*Gutehoffnungshütte GmbH*, 141 F.3d 1434, 1447 (11th Cir.1998)). "Prejudgment interest is imposed . . . to divest those found liable under the securities laws of any benefit accrued from the use of the ill-gotten gain." *SEC v. Yun*, 148 F. Supp. 2d 1287, 1293 (M.D. Fla.2001)(citation omitted). Whether to award prejudgment interest is a question of fairness, and the Court must consider the equities. *See Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1536 (11th Cir.1987)(citation omitted).

I recommend that the Court award prejudgment interest in this case in order to divest GMC of any benefit that it has accrued from the use of the ill-gotten gain. In order to calculate prejudgment interest, the Court must first establish the judgment amount, the prejudgment interest rate and the date from which prejudgment interest accrues. *See Carrillo*, 325 F.3d at 1272. The IRS underpayment rate has been accepted as an appropriate rate for this purpose. *See* Doc. No. 14 at 5; *accord Yun*, 148 F. Supp. 2d at 1293 (citation omitted). "The time frame for the imposition of prejudgment interest usually begins with the date of the unlawful gain and ends at the entry of judgment." *Yun*, 148 F. Supp. 2d at 1293 (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996)). Because the SEC has not established the precise dates on which GMC acquired the funds to be disgorged, it asks that the Court compute prejudgment interest from the date the complaint was filed. This is an appropriate starting point, as the monies were fraudulently obtained before the complaint was filed. *See* Zaki Decl. ¶ 6; *see also* Doc. No. 14 at 5.

Therefore, I recommend that the Court direct the SEC to provide it with the calculation of prejudgment interest at the IRS default rate as of a date certain on which judgment will enter.

**4. Civil Penalty.**

The SEC also seeks a civil penalty pursuant to 15 U.S.C. § 77t(d) and 15 U.S.C. § 78u(d)(3). "By enacting these penalty provisions, 'Congress sought to achieve the dual goals of punishment of the individual violator and deterrence of future violations." *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996). For violations involving fraud, deceit or manipulation and that directly or indirectly result in or create the rise of substantial losses to others, it is permissible to impose a third-tier penalty in an amount up to the greater of [$650,000][3] or the defendant's gross pecuniary gain as a result of each violation." *SEC v. Asset Recovery Mgm't Trust, S.A.*, No. 2:02-CV-1372-WKW, 2008 WL 4831738, at *10 (M.D. Ala. Nov. 3, 2008).

GMC's securities violations involved fraud, deceit, and manipulation, and they directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons. As such, a third tier civil penalty is appropriate. At the time the motion was filed, the SEC had not obtained authority to seek a specific penalty amount. It has not yet advised the Court of its recommendation even though more than three months has passed since its original motion for default judgment was filed. Accordingly, I recommend that the SEC file its recommendation regarding the civil penalty amount supported by a memorandum of law within ten days of the date of this Report and Recommendation.

---

[3] The adjusted maximum penalty amount for corporations engaged in conduct resulting in substantial losses was increased to $650,000 effective for violations occurring after February 14, 2005. 17 C.F.R. § 201.1003; 17 C.F.R. Pt. 201, Subpt. E, Tbl. III.

## V. RECOMMENDATION.

For the reasons stated above, I recommend that the Court:

1. **GRANT** in part the Plaintiff's Amended Motion for Default Judgment Against Defendant GMC Holding Corp., doc. no. 24;

2. **ORDER** GMC Holding Corp. to disgorge to the SEC the sum of $2,090,000.00;

3. **ORDER** the SEC to submit a calculation of prejudgment interest accruing on February 22, 2008 through a date established by the Court for entry of judgment;

4. **AWARD** civil penalties against GMC in an amount consistent with third tier penalties pursuant to 15 U.S.C. § 77t(d)(2)(C) and 15 U.S.C. § 78u(d)(3)(B)(iii);

5. **DENY** the motion in all other respects; and,

5. **DIRECT** the Clerk to enter judgment in favor of the SEC and against GMC Holding Corp. in the amount directed by the Court.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on December 23, 2008.

Karla R. Spaulding

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party

Courtroom Deputy